# EXHIBIT "A"

# EXPERT REPORT OF BRIAN T. FARRINGTON

## EXPERT REPORT OF BRIAN T. FARRINGTON IN *LITTLE  v. TECHNICAL SPECIALTY PRODUCTS, et al.*

I was retained by Jenkins & Watkins to provide a professional opinion on whether defendants' changed drive time policy would or could result in failure to count certain time spent in travel for defendants toward overtime which would qualify as hours worked under the relevant regulations and enforcement policies of the U. S. Department of Labor, Wage and Hour Division. I have also been asked to give an opinion on the propriety of automatic deductions from total hours worked for meal breaks. Further, I have been asked to opine on whether requiring employees to pay for certain maintenance on company trucks leads or could lead to violations of the FLSA. Finally, I have been asked to provide a professional opinion on whether the defendants' threat to withhold paychecks, and refusal to record as hours worked time when employees worked through lunch breaks, should be taken into consideration in determining if defendants acted in the reasonable, good faith belief that their conduct complied with the FLSA.

## BACKGROUND

I was employed by the United States Department of Labor, Wage and Hour Division ("Wage and Hour" or "USDOL/WH") from 1975 to 1989, with 18 months off for graduate school. From 1975 to 1984, I was a Compliance Officer (an investigator) in Chicago, Illinois and then in Fort Worth, Texas. My primary function was to enforce the laws administered by the Wage and Hour Division, primarily the Fair Labor Standards Act ("FLSA"). I conducted anywhere from 500 to 600 full investigations during this time, as well as 300 to 400 more limited compliance actions. From 1984 to 1989 I was the Assistant District Director in Dallas (the position has also been known as "Director of Enforcement"). I supervised from 12 to 16 investigators in this position. I assigned them their cases, assisted and advised them during the conduct of their investigations, and reviewed their completed case files. During this review, I evaluated whether the evidence supported the investigators' findings and conclusions and whether the FLSA had been properly applied. I determined whether claimed and/or potentially applicable exemptions had been correctly found to be applicable or not. I also reviewed the interviews conducted by the investigator to see if they supported the investigator's findings adequately. When back wages were computed, I reviewed those computations for both accuracy and proper methodology.

When the investigator was unable to resolve outstanding issues, I met with employers and/or their attorneys in second level conferences to attempt to settle the cases. If no resolution acceptable to the agency could be reached, I made the decision whether a file was suitable to send to the Regional Solicitor of Labor with a recommendation for litigation. If litigation was recommended, I ensured that conclusions were sound and supported by the evidence, and commented on additional factors such as evidence of willfulness. I estimate that I supervised approximately 5,000 investigations while I was Assistant District Director.

I left the Department of Labor in 1989 and went into private consulting on wage and hour and other labor matters with a consulting firm called Harry Weisbrod Associates, which I subsequently purchased. I also attended law school after leaving the Department of Labor and received my J.D. from the Texas Wesleyan School of Law and was licensed to practice law in 1994. My law practice consists almost exclusively of representing and advising clients in wage and hour and EEOC matters. When appearing as an expert witness, I have been engaged by both plaintiffs and defendants. I also do many speeches, seminars and training programs on FLSA and other employment issues.

Since 1989, I have spent a substantial portion of my time in dealing directly with USDOL/WH while representing clients in investigations. I also maintain professional relationships with a number of agency personnel, and discuss developments in the law and in agency policies, procedures, and interpretations of the law with them. I am therefore up to date on the agency's policies, procedures, interpretations, and enforcement positions. In addition, I keep myself informed on developments in the statutes enforced by USDOL/WH, especially the FLSA, and in relevant regulations and opinions. I also keep up with FLSA case law. I apply this knowledge continuously in advising employers on wage-hour issues and representing them in USDOL/WH investigations. I continue to publish on such issues, as noted below.

## DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

1.    Plaintiff's Original Complaint

2.    Defendants' First Amended Answer

3.    Defendants' Employee Manual, Little 00052 – 00078

4.    Defendants' 9/23/11 Drive Time Policy, Little 00240 – 00243

5.    Defendants' Time Sheets and Payroll Information About Plaintiff, TSP 031 – 176

6.    Plaintiff's Rule 26(a)(2) disclosures

7.    Plaintiff's Responses to RFA's

8.    Plaintiff's Interrogatory Responses, and

9.    Plaintiff's 1st Supp. Interrogatory Responses.

10.    Defendants' Initial Disclosures

11.    Defendant TSP's Interrogatory Responses

12.    Defendant Donna Lear's Interrogatory Responses, and

13.    Defendant Keith Lear's Interrogatory Responses

14.    Plaintiff's Deposition Transcript

15.    Text Messages Between Plaintiff and Defendants re:  Lunch Deduction, Little 00245 – 00246

16.    Defendant Keith Lear's Deposition Transcript

17.    Defendant Donna Lear's Deposition Transcript

18.    Federal Highway Administration document FHWA-PL-ll-022, *Summary of Travel Trends: 2009 National Household Travel Survey*

## OTHER CASES IN WHICH I HAVE TESTIFIED AS EXPERT IN RECENT YEARS

1.    United States District Court for the Northern District of Georgia, Rome Division, Case No. 4:99-CV-0001-HLM (*McDermott, et al. v. Cracker Barrel Old Country Store, Inc.*). Expert for Plaintiffs on compensability of lock-in time, and payment of minimum wage for side work.  Deposition.

2.    United States District Court for the District of Oregon, Case No. MDL Docket No. 1439 (*In re: Farmer's Insurance Exchange Claims Representatives' Overtime Pay Litigation*).  Witness for Defendant re: claims representatives in FLSA case.  [Note: gave no opinion testimony, but reported on results of test sample claims.]  Trial testimony.

3.    District Court, City and County of Denver, Case No. 01CV4773 (*Chase v. Farmer's Insurance Exchange, Inc.*). Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Colorado wage and hour case.  Deposition.

4.    District Court, Fourth Judicial District, State of Minnesota, County of Hennepin, Court File EM 01-015004 (*Milner, et al. v. Farmers Insurance Exchange, et al.*). Expert for Defendant re:  exercise of discretion and independent judgment by claims representatives in Minnesota wage and hour case.  Deposition.

5.    United States District Court for the Western District of Texas, Case No. EP-02-CA-0564-FM (*Acosta v. County of El Paso*). Expert for Defendant re:  off clock hours allegedly worked by detention officers, and offset of off-clock hours by paid lunch period.  Deposition.

6.    United States District Court for the Northern District of Alabama, Western Division, Civil Action No. CV-01-C-0303-W (*Morgan et al. v. Family Dollar Stores, Inc.*). Expert for the Plaintiffs re:  application of the executive exemption. Deposition.

4

7.    United States District Court for the District of Arizona, Case No. CIV03 2262 PHX ROS (*Hutton v. Bank of America*). Expert for Defendant re: administrative exemption, back wage computation, willfulness. Deposition.

8.    Judicial Court, 49th Judicial District, Webb Co., Texas, Case No. 2003 CV F000553D1 (*The Laredo National Bank and Homeowners Loan Corporation v. Jacob Monty and the Monty Law Firm, P.C.*). Expert for Defendant re: reasonableness of attorney's opinion on administrative exemption. Deposition.

9.    United States District Court for the Southern District of Florida, Case No. 04-22640 CIV-JORDAN (*Garcia v. Port Royale Trading Co.,    Inc., et al.*). Expert for Defendant re: back wage calculation. Deposition.

10.    United States District Court for the Northern District of Alabama, Southern Division, Case No. CV-02-TMF-1174-S (*Chao v. Tyson Foods, Inc.*). Expert for Defendant re: willfulness. Deposition

11.    United States District Court for the Northern District of Alabama, Western Division, Case No. 7:06-CV-01538-LSC (*Womack v. Dolgencorp, Inc., et al.*). Expert for Plaintiffs re: executive exemption. Deposition

12.    American Arbitration Association Arbitration Forum, AAA Case No. 111600019404 (*Cole, et al. v. Long John Silver's Restaurants, Inc. and Long John Silver's, Inc.*). Expert for Plaintiffs re: salary basis of payment for executive exemption. Deposition and live testimony at hearing.

13.    153rd District Court of Tarrant County, Texas CAUSE NO. 153-248153-10 (*Czarnecki, et al. v. Diesel Pros, LLC & Michael Kelly.* Expert for plaintiffs re: employment relationship under the FLSA. Trial testimony.

## PUBLICATIONS

1.    Wage-Hour Compliance.  Book published 1995 by Warren, Gorham and Lamont, NY, NY.

2.    Wage Hour and EEOC Compliance and Litigation Prevention.  Published 1991 by the Professional Development Institute at the University of North Texas, Denton, TX.  Training manual for all day course on the subject.

3.    A CPA's Guide to Workplace Regulation.  Published 2000 by the American Institute of CPA's.  Training manual for an all day course on the subject.

4.    Society for Human Resource Management, "Legal Report" on the 1996 FLSA Amendments.

5.    I wrote several articles for "Payroll Perspectives," a newsletter published by Ernst and Young.

6.    I wrote several articles for "Auto, Inc.," a magazine published by the Automotive Service Association.

7.    I wrote several articles for "Self Storage," a magazine published by the Self Storage Association.

8.    Harry Weisbrod Associates previously published a bi-monthly newsletter in which I wrote regularly.

9.    I have written other articles for industry groups over the years that I have not kept track of.

10.   A Wage and Hour Compliance in the Self Storage Industry.  Published 2006 by the Self Storage Association, Alexandria, Virginia.  Review of FLSA requirements and of major state wage and hour law considerations as they apply to employers in the self storage industry.

11.   Chapter on employment law in Guide to Restaurants and Bars, updated annually.

12.   Chapter on FLSA, garnishments in Principles of Payroll Administration, published/updated annually by Warren, Gorham, Lamont

13.   Chapter on Wage-Hour in Payroll Answer Book, published 2010, Aspen Publishers.

## OPINIONS AND BASIS

## METHODOLOGY

Where I am engaged as an expert witness, I am called upon to adapt Wage and Hour investigative techniques to the litigation context.  For example, depositions are usually substituted for interviews.  In this particular case, I read the depositions taken.  In addition, I reviewed time and payroll records for plaintiff, examined relevant employer policies, and reviewed other information produced in discovery.

The opinions I express in this report are of the same type that I would have developed in my work for the USDOL/WH, and subsequently in advising clients on wage and hour issues.  I hold all of my opinions to a reasonable degree of certainty in my field.  The work I have done and the methods I used in this case are the same type of work that I did while employed at USDOL/WH and use the method I used at the agency when addressing possible overtime violations.  I was as careful in performing the work in this case as I was when at USDOL/WH, and in my normal professional activities.

## STATUTORY AND REGULATORY FRAMEWORK

The Fair Labor Standards Act of 1939, as amended (29 U.S.C. §§ 201 et seq.) (hereinafter "FLSA" or the "Act") generally requires that employees be paid a minimum

6

wage ( 29 USC 206) for all "hours worked," and overtime (29 USC 207) for "hours worked" in excess of 40 hours in a workweek. The statute also calls for the Secretary of Labor to issue regulations on recordkeeping (29 USC 211), and in those regulations (29 CFR 516), employers are required to keep accurate records, each day and each workweek, of the "hours worked" by all of their employees, with a few limited exceptions not relevant here. Nowhere in the statute, however, is the term "hours worked" defined. Consequently, it is to the courts that we must turn for a definition, in particular to a series of relatively early Supreme Court decisions. USDOL/WH has issued an interpretive regulation entitled "Hours Worked Under the Fair Labor Standards Act," 29 CFR 785, which contains the Department's efforts to enunciate the general principles concerning hours worked which can be gleaned from the various court decisions. Regulation 785 also contains a number of USDOL/WH's interpretations, guidance, and enforcement positions. (The agency has also promulgated interpretations, guidance, and enforcement positions through Administrator's Opinion Letters, and in various sections of its Field Operations Handbook).

As a general summary, 29 CFR 785 says that hours worked includes:

-all time employees are required to be on their employer's premises; and

-all time employees are required to be at a prescribed work site; and

-all time employees spend in activities which are of benefit to their employer. (see in particular 29 CFR 785.7)

During the period between the passage of the FLSA in 1938, and 1947, a number of courts determined that certain activities which many employers did not consider to be hours worked were in fact compensable. These included such activities as miners' travel from the mine gate to the "face of the seam" (*Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U. S. 590, 598 - 599 (1944)), and time spent by employees walking from time clocks to their work stations (*Anderson v. Mt. Clemens Pottery*, 328 U.S. 690, 690 – 691(1946). Congress passed the Portal to Portal Act, 29 USC 254 et seq. (the "Portal Act" or "PA") in response to such holdings, claiming that they "creat[ed] wholly unexpected liabilities, immense in amount and retroactive in operation," resulting in "windfalls" for employees. The Portal Act states, in relevant part:

Section 4 of this Act provides that:

(a) Except as provided in paragraph (b), of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, ... on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in, on, or after May 14, 1947:

(1) **Walking, riding, or traveling to and from the actual place of performance** of the principal activity or activities which such employee is employed to perform....

7

The PA goes on to state:

(b) Notwithstanding the provisions of paragraph (a) of this section which relieve an employer from liability and punishment with respect to an activity the employer shall not be so relieved if such activity is compensable by either:

(1) An **express provision of a written or nonwritten contract** in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; **or**

(2) A **custom or practice** in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, **not inconsistent with a written or nonwritten contract**, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer. (emphasis added)

## DEFENDANTS' AMENDED DRIVE TIME POLICY

Prior to the pay period ending September 23, 2011, defendants had a policy of compensating all the time technicians such as plaintiff spent driving during the performance of their duties. Moreover, such time was treated as hours worked by defendants, meaning that if the total number of hours plaintiff spent driving, plus hours spent by plaintiff performing other work such as working on rigs, exceeded 40 hours in any given workweek, overtime would be paid. Effective September 23, 2011, however, defendants changed their policy:

Effective immediately the policy for drive time is as follows:

Drive time to/from job sites and hotels will no longer be paid as overtime hours. If more than 40 hours for the week have already been worked, Employee will still receive regular pay for drive time hours and overtime pay for rig time hours. (Little 00241)

At issue in this case is plaintiff's contention that he was fired in retaliation for objecting to this policy. I have not been engaged to opine on whether plaintiff was dismissed in retaliation for complaining about the drive time policy, although I will point out certain facts which, if he were fired in retaliation for complaining about the policy, would be relevant to his claim. I have been asked to analyze this policy and its application to plaintiff to determine whether it could potentially and/or did actually result in violations of the FLSA by refusing to treat as hours worked for overtime purposes certain hours which should be/have been treated as hours worked.

The language of the policy is somewhat ambiguous. It is not clear on its face what is meant by "[d]rive time to/from job sites and hotels...." In response to an interrogatory request from plaintiff, defendant TSP described the policy as follows:

Defendant pays straight time for hours spent driving to a job site from an employee's dwelling, and pays straight time for hours spend driving from a job site back to his or her dwelling. Defendant pays overtime for hours worked at the jobsite and spent driving between job sites when those hours exceed 40 hours per week. (TSP's Response to Interrogatory No. 8 of Plaintiff's First Set of Interrogatories)

In her deposition Donna Lear, in a very lengthy colloquy with plaintiff's counsel, attempted to describe the policy. It appears that the following eventually emerged as her characterization of the policy:

3   Q.  Let me ask it differently, because my

4   question may have been bad.  What hours after

5   the September 23rd policy changed, what hours

6   would count toward overtime hours, say if they

7   reached a 40 hour week --

8   A.  Everything would count as hours, except for

9   your drive time -- your first -- from your home

10   to your first site, that did not count as --

11   Q.  Got --

12   A.  Wait a minute.  That did not count as

13   overtime.  Okay.  In between, everything got

14   counted as overtime if he went over 40 hours,

15   except the last job site, home, did not count as

16   overtime.  Those two things were always

17   considered straight time.  Anything in between

18   that was overtime. (Donna Lear Depo., p. 136, ll. 3 – 18)

In his deposition, Keith Lear described the policy as follows:

9   …in your mind what's the difference

10   between the new policy and the old policy?

9

11    A.  Well, the difference was that -- I mean

12    these guys are leaving from their house and

13    they're driving to the rig and then they go

14    around all of these different rigs and they

15    drive back home.  Well, I mean I don't have to

16    pay, per the law, from the dwelling to the job

17    site or from the job site back to the dwelling,

18    but I did it as a favor to these guys because I

19    would not want to drive for free and I didn't

20    have to pay them at all to drive.

21    Q.  You did it before as a favor or the new

22    policy?

23    A.  Well, in the new policy, because I had

24    thought about just not paying them at all, but I

25    said, you know what, I'm going to give them

                              60

1    straight time because I'm going to look at that

2    as, you know, basically you've got to drive, so

3    I'm going to pay you something.

4    Q.  Just to make sure I understand, you thought

5    about having a new policy that says, we're not

6    going to pay you at all for driving time from

7    your home to the job site --

8    A.  Correct.

9    Q.  -- or the job site back?

                              10

10  A.  Correct.

11  Q.  But you didn't decide to implement that

12  policy?

13  A.  Correct.

14  Q.  You decided to still count those drive time

15  hours and pay straight time on that?

16  A.  That is correct.

17  Q.  But just not pay it in overtime?

18  A.  It will not count as overtime. (Keith Lear Depo., p. 59, l. – p. 60, l. 18

## HOME TO WORK TRAVEL—GENERAL RULE

Home to work travel, what we generally describe as commuting, is not hours worked:

> An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home to work travel which is a normal incident of employment. This is true whether he works at a fixed location or at different job sites. Normal travel from home to work is not worktime. (29 CFR 785.35)

This is a very simple and unremarkable position.

## HOME TO WORK WHEN SIGNIFICANT DISTANCES ARE INVOLVED

The Federal Highway Administration estimates the average one-way commuting distance in the United States in a private vehicle in 2009 was 12.09 miles, and the average commuting time is 22.85 minutes. (Federal Highway Administration document FHWA-PL-ll-022, *Summary of Travel Trends: 2009 National Household Travel Survey*, Table 27). As noted in 29 CFR 785.35, such travel is not hours worked, barring unusual circumstances. The issue of whether driving from home to a job site when significant distances are involved is more complicated than the typical commute, however. The USDOL/WH regulations address two possible scenarios. Section 785.37 discusses "Home to work on special one-day assignment in another city," while Section 785.39 discusses  "Travel away from home community."

29 CFR 785.37 says:

A problem arises when an employee **who regularly works at a fixed location** in one city is given a **special 1-day work assignment in another**

11

city. For example, an employee who works in Washington, DC, with regular working hours from 9 a.m. to 5 p.m. may be given a special assignment in New York City, with instructions to leave Washington at 8 a.m. He arrives in New York at 12 noon, ready for work. The special assignment is completed at 3 p.m., and the employee arrives back in Washington at 7 p.m. **Such travel cannot be regarded as ordinary home-to-work travel occasioned merely by the fact of employment. It was performed for the employer's benefit and at his special request to meet the needs of the particular and unusual assignment. It would thus qualify as an integral part of the "principal" activity** which the employee was hired to perform on the workday in question; it is like travel involved in an emergency call (described in § 785.36), or like travel that is all in the day's work (see § 785.38). All the time involved, however, need not be counted. Since, except for the special assignment, the employee would have had to report to his regular work site, the travel between his home and the railroad depot may be deducted, it being in the "home-to-work" category. Also, of course, the usual meal time would be deductible.

If this section applies to plaintiff's situation, then clearly the defendant's 9/23/11 policy change calls for a violation of the statute. In the days immediately following the issuance of the new policy, plaintiff drove to and/or from his home in McKinney to such places as Bandera, Pecos, Sunset, Springtown, Midland, and Big Spring, Texas. These locations are, respectively: 347, 463, 77, 81, 358, and 317 miles distant from McKinney (distances from city to city, no particular address, from Google Maps website). By any stretch of the imagination, distances of 300+ miles qualify as one day travel to another city, which would make defendant's policy excluding such travel from hours worked clearly illegal.

It is not clear, however, that this section applies to plaintiff's situation. Plaintiff did not "regularly work[s] at a fixed location in one city...." He had no regular worksite, but rather traveled to whichever of his employer's customer's sites where he was needed. Further, his lengthy travel, while it was "performed for the employer's benefit," was not performed "at his special request to meet the needs of the particular and unusual assignment." Rather, it was the regular and routine pattern of his job. In a similar case, *Kavanagh v. Grand Union*, 192 F.3d 269 (2nd Cir. 1999), the 2nd Circuit found that the driving time of an employee who had to drive long distances and hours from his home to a job site and back again home on the same day was not compensable hours of work.

In *Kavanagh*, the Court described the plaintiff's job:

Between 1994 and 1996, Kavanagh was periodically employed by Grand Union as a refrigerator and utility mechanic. He **did not have a fixed work location**, but instead was required to travel to various of Grand Union's more than fifty stores in Connecticut and New York, including some in upstate New York. Kavanagh resided in New York on Long Island, first in Patchogue and then in Bellport. He received his work assignments from Grand Union over the telephone. Id. (emphasis added)

12

Kavangh wanted to be paid for his extensive driving time, and relied on 785.37, claiming that his travel fit that sections description of one-day travel to another city.

The court disagreed.  They said that Kavanagh's travel was not unusual.  Rather, it was a contemplated, normal part of his job:

> In sum, the regulations as currently written do not permit a construction that would require Grand Union to compensate Kavanagh for his time spent traveling to the first job of the day and from the last job of the day, regardless of the length of that distance or the benefit to Grand Union of having only one employee cover such a large geographic area.  Because this extensive travel was a contemplated, normal occurrence under the employment contract entered into between Kavanagh and Grand Union, 29 C.F.R. § 785.35 forecloses Kavanagh's entitlement to compensation under the FLSA. *Id.* @ 273

In another case, this one involving travel by farm workers, the Fifth Circuit said that commutes of up to 4 hours were not hours worked:

> Several facts have persuaded us that the travel time here was indisputably ordinary to-work or from-work travel and not compensable. The workers rode Gasper's buses to work and back. Unlike the plumbers in Dole v. Enduro Plumbing, 117 Lab.Cas. (CCH) p 35,418, the workers here performed no work prior to or while riding on Gasper's buses. They did not load tools or engage in activities that prepared them or their equipment for picking chile peppers before or while riding the buses. The workers were told on the bus which field they would pick and what the pay rate would be each day. Merely receiving this information is not enough instruction from Gasper to render the time compensable. See 29 C.F.R. Sec. 785.38 (1990); Dolan, 558 F.Supp. at 1309-11. The workers were not required to use Gasper's buses to get to work in the morning. They chose where they lived and how to get to and from work. Not all of Gasper's field workers rode his buses. The fact that the travel time was so long does not make it compensable under the statute. See 29 C.F.R. Sec. 790.7 (1990). That Gasper owned the buses or that he considered workers "hired" if they were on the buses when they left the pickup site does not matter under the statute. See Sen.Rep. No. 48, 80th Cong., 1st Sess., at 48 (1947); Wirtz v. Flint Rig Co., 222 F.Supp. 707 (D.Mont.1963) (that employer owned bus does not matter). We note that there was no travel between job sites after the workers began picking chile peppers. The travel time was just an extended home-to-work-and-back commute. We hold that the travel time here is a noncompensable preliminary and postliminary activity based on the Portal-to-Portal Act and related jurisprudence. *Vega v. Gaspar*, 36 F.3d 417 (5th Cir. 1994)

The 10th Circuit said that oil field workers whose commutes as passengers were up to 3 ½ hours were not entitled to be paid for their commuting time—see *Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1288-90 (10th Cir. 2006)

In a very recent case, the 5th Circuit, citing both its prior holding in *Vega* as well as that of the 10th Circuit in *Aztec*, reiterated that home to work travel is not hours worked in a commuting situation:

> The DOL reasoning thus confirms not only that time is appropriate to measure what constitutes a normal commute for purposes of the ECFA, but also that commute times of up to one hour would comply with that statute. Other courts have ruled that commutes far longer than thirty-five minutes are within the definition of ordinary home to work travel and are hence non-compensable under the Portal-to-Portal Act. See, e.g., Smith v. Aztec Well Serv'g Co., 462 F.3d 1274, 1288-90 (10th Cir. 2006) (commutes of up to three and half hours non-compensable); Vega, 36 F.3d at 424 (daily commutes of up to four hours non-compensable). *Chambers v. Sears Roebuck & Co.*, 428 Fed. Appx. 400, 411(5th Cir. 2011)

In part, the Court in *Chambers* relied on the Employment Commute Flexibility Act, which amended the Portal Act in 1996 to address commuting in employer owned vehicles:

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such a vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee. 29 U.S.C. § 254(a)

Based on these cases, one might conclude that plaintiff's driving time from home to and from job sites was not compensable. However, a closer look at these cases allows us to distinguish them, and to show that plaintiff's drive time, including between job sites and home, is in fact hours worked under the Act.

This is so because comments in *Chambers* suggest that the 5th Circuit is not convinced that commutes as long as plaintiff's are in "normal commuting area." The Court quoted an Opinion Letter from the Wage-Hour Administrator, which said in part:

> Guidance from the Department of Labor ("DOL") confirms this interpretation. In a 1999 Opinion Letter interpreting the ECFA, the DOL stated that a home-based employee traveling in a company van would not need to be compensated for travel from home to a work site unless "**the time involved is extraordinary.**" U.S. Dep't Lab. Op. Ltr. (January 29, 1999). The Opinion Letter continued:

14

For example, where a field engineer's commute to the first job site in the morning takes four hours, we would consider the greater portion of travel time compensable under the principles described in 29 C.F.R. § 785.37. That rule allows a portion of the total commute time to be considered non-compensable home-to-home travel. If the employer treated three of the four hours as compensable travel, we would not question such practice.

Id. The DOL reasoning thus confirms not only that time is appropriate to measure what constitutes a normal commute for purposes of the ECFA, but also that **commute times of up to one hour** would comply with that statute. (emphasis added)

So the DOL Opinion Letter, cited with approval by the Fifth Circuit, holds that travel to the first job site of the day of longer than an hour WOULD be compensable hours of work. This would appear to be contrary to the 2nd Circuit's holding in *Kavanagh*, and even to the prior holding in *Gaspar*, but upon closer examination, it is not.

In *Gaspar*, employees simply rode on busses to and from their work site. In *Chambers*, the employees were actually driving, and were driving to and from work sites in employer-owned vehicles containing tools and parts which were to be used by the employees in performing their principal activities, but only for an average of 35 minutes to and from their first and last work sites, respectively. The DOL Opinion says that up to an hour to the first job site is normal commuting, while time in excess of that driving the employer's vehicle is work time.

There are some other bases for distinguishing the *Gaspar* and *Kavanagh* holdings from the DOL Opinion cited with approval in *Chambers*. In *Kavanagh*, the employee usually, although not always, drove his own vehicle ("While Kavanagh occasionally used a Grand Union vehicle, he usually traveled in his own truck, carrying with him all of the equipment he needed to make repairs...." 192 F.3d @ 269). In *Chambers*, the employees drove company vehicles, but not more than an hour. In *Gaspar*, the duration was long—four hours—but the employees merely rode, and the same is true in *Aztec*.

So to the extent that *Kavanagh* is contradicted by *Chambers*, *Chambers* is controlling in the Fifth Circuit. And the holding in *Chambers* is consistent with the express position of USDOL/WH.

More important, in *Kavanagh*, *Aztec*, *Gaspar*, and *Chambers*, the employees always went "out and back" on the same day: "Gasper had a "day haul operation" in which potential workers who hoped to be hired that day would assemble at a pickup point. Each worker was employed on a daily basis and would be rehired each day that the worker arrived at the pickup point on time (provided there was sufficient available work)." "Kavanagh was required to be at the site to which he was assigned by 8:00 a.m. and his work day ended at 4:30 p.m., after which he would return to his home. Grand Union compensated Kavanagh for the time he spent during the day traveling between job sites, but not for his travel time between his home and the first job of the day, nor

between the last job of the day and his home." And in both *Aztec* and *Chambers*, the employees commuted out and back on the same day. In none of the cases did the employees spend the night away from home.

Is this significant? It is in terms of the regulations. DOL addresses "commuting" in 785.35, and "out and back" in 785.37. In 785.39, the regulations address "Travel away from home community," which is described thus:

> Travel that keeps an employee away from home overnight is travel away from home. Travel away from home is clearly worktime **when it cuts across the employee's workday**. The employee is simply substituting travel for other duties. The time is not only hours worked on regular working days during normal working hours but also during the corresponding hours on nonworking days. Thus, if an employee regularly works from 9 a.m. to 5 p.m. from Monday through Friday the travel time during these hours is worktime on Saturday and Sunday as well as on the other days. Regular meal period time is not counted. As an enforcement policy the Divisions will not consider as worktime that time spent in travel away from home outside of regular working hours as a **passenger** on an airplane, train, boat, bus, or automobile. (emphasis added)

Note that travel outside of regular hours **as a passenger** is not compensable. Plaintiff was not a passenger. He was a driver, part of whose principal activities was transporting tools and parts to his employer's customers' job sites. And he had no "normal working hours" and no "regular working days." It is clear that when he traveled to a site, worked on that site, then traveled to another city, checked into a hotel, and then traveled to another site, all of that driving time was compensable hours worked.

At best, defendants could still try make a colorable argument that when plaintiff drive from his home directly to a remote site, even one several hundred miles away, and then returned that same day without spending the night away from home, the travel was not hours worked under the reasoning of *Kavanagh*, and possibly *Gaspar*. The better view, however, is expressed in the DOL Opinion Letter which asserted that all time beyond one hour in such a scenario was hours worked, and would not be paid under the employer's 9/23/11 policy. And, of course, the reasoning of this Opinion Letter was accepted by the Fifth Circuit in *Chambers*. If plaintiff went out of town and spent the night away from home, all his drive time, even between his home and a job site (or at least all beyond one hour of drive time between home and site), was hours worked.

## DOES PAYING FOR THE DRIVING TIME TURN IT INTO HOURS WORKED?

### STATUTORY PROVISIONS

One of the most striking components of the Portal Act is the fact that almost all of the preliminary and postliminary activities excluded from hours worked become hours worked if paid for. Under the 9/23 policy such travel is compensated, although travel from home to the first site and from the last site to home was not to be counted as hours

worked. The Portal Act states that preliminary and postliminary activities which would otherwise be excluded from hours worked **become hours worked if they are paid for,** either under the explicit terms of an agreement or by a custom, contract, or practice not inconsistent with an employment agreement:

> (b) Notwithstanding the provisions of paragraph (a) of this section which relieve an employer from liability and punishment with respect to an activity the employer shall not be so relieved if such activity is compensable by either:

> > (1) An **express provision of a written or nonwritten contract** in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; **or**

> > (2) A **custom or practice** in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, **not inconsistent with a written or nonwritten contract,** in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer. 29 USC 254(b) (emphasis added)

## REGULATORY PROVISIONS

Under this principle, all drive time hours are compensated, so all would appear to be hours worked. But there is still another wrinkle:

> But where, apart from the Portal Act, time spent in such an activity would not be time worked within the meaning of the Fair Labor Standards Act, although made compensable by contract, custom, or practice, such compensability will not make it time worked under section 4(d) of the Portal Act. 790.5(a)

> 787.34 applies this principle explicitly to commuting:

> If compensable by express contract or by custom or practice not inconsistent with an express contract, such traveltime must be counted in computing hours worked. **However, ordinary travel from home to work (see § 785.35) need not be counted as hours worked even if the employer agrees to pay for it.** (emphasis added).

## WAGE-HOUR ADMINISTRATOR'S OPINIONS

The courts and the Department of Labor have been inconsistent in their application of this principle. In a November 23, 1984 Opinion, the Wage-Hour Administrator said:

> As indicated in section 785.34, section 4 of the Portal-to-Portal Act of 1947 provides that **time spent by an employee in regular daily travel**

**between home and workplace at the beginning and end of the workday is not compensable worktime unless so provided by contract, custom or practice.**

In a telephone conversation with a member of my staff, you indicated that although it was the intent of the parties to the collective bargaining agreement to compensate employees for the home-to-work travel under discussion here, it was also their intent to exclude such hours from hours worked (section 5, paragraph 6). Therefore it is our opinion that the payment for the travel time does not make such time "hours worked" under FLSA (see 29 CFR Part 778, section 778.320(b). 1984 DOLWH LEXIS 39 November 23, 1984

In another Opinion from a few years earlier, the Administrator said: "Section 785.34 of Part 785 provides, among other things, that **ordinary travel from home to work need not be counted as hours worked even if the employer agrees to pay for it.**" (emphasis added). 1981 DOLWH LEXIS 44 April 15, 1981

In an Opinion addressing travel between home and/or a labor camp and a worksite, however, the Administrator said:

Normal travel from home to work, or from a temporary residence such as a labor camp to the worksite is not worktime under the Fair Labor Standards Act and the Portal-to-Portal Act of 1947. This is true whether the worker is working at a fixed location or at different worksites (29 CFR 785.34 and 785.35). We recognize that farmworkers who reside in labor camps are generally provided transportation to and from the worksites by the agricultural employer. It is our opinion that the travel performed by these employees at the beginning and end of the workday is ordinary home to work travel. The fact that an employer provides the employee with transportation to a principal activity (Administrator's opinion letter, copy enclosed, dated April 8, 1968). However, **if there is a custom, contract, or practice providing that an employee's regular daily travel between home or labor camp and the workplace at the beginning and/or end of the workday is compensable, such time will be so regarded under the provisions of section 4 of the Portal-to-Portal Act of 1947 as indicated in 29 CFR 785.34.** 1978 DOLWH LEXIS 13 February 9, 1978

Prior Opinions manifest the same inconsistency:

Travel time at the start or end of the workday need not be counted as working time unless it is compassable by contract, custom or practice. However, **ordinary travel from home to work (or from the bridge at the border to the fields) need not be counted as hours worked even if the employer agrees to pay for it. See 29 CFR 785.34 and 785.35.** 1977 DOLWH LEXIS 31 August 26, 1977

18

\*    \*    \*    \*    \*

As indicated in section 785.34 of Part 785, section 4 of the Portal-to-Portal Act of 1947, provides that **time spent by an employee in his regular daily travel between his home and his workplace at the beginning and end of his workday is not compensable worktime under the act unless so provided by contract, custom, or practice.** 1968 DOLWH LEXIS 85 April 8, 1968

\*    \*    \*    \*    \*

It appears that the travel activity involved is preliminary and postliminary travel before and after the employees' workday at the job site of the kind referred to in section 4 of the Portal-to-Portal Act of 1947. **The time spent in such travel between Kwajalein and Mack Island under section 4 of the Portal-to-Portal Act would be counted as hours worked only if the travel activity itself were made compensable by contract, custom, or practice.** Inasmuch as you state there is no custom or employment contract covering this matter nor is there a collective bargaining agreement in affect at Kwajalein, this time need not be counted as hours worked under the Fair Labor Standards Act. See sections 785.9, 785.34 and 785.35 of Interpretative Bulletin, Part 785. 1967 DOLWH LEXIS 200 July 17, 1967

POSITION OF THE COURTS

The Courts have shown a similar inconsistency:

Thus, the exceptions to the Portal Act do not render compensable time that would not otherwise have been compensable under the FLSA. 29 C.F.R. § 790.7 ("[E]ven where there is a contract, custom, or practice to pay for time spent in such a 'preliminary' or 'postliminary' activity, section 4(d) of the Portal Act does not make such time hours worked under the Fair Labor Standards Act."). Accordingly, Plaintiffs' start-end travel time, even if they were paid for it, would not be included in computing their hours worked for overtime purposes if it were considered travel from work to home. *Gilmer v. Alameda-Contra Costa Transit Dist.*, 159 Lab. Cas. (CCH) P35,692 2010 U.S. Dist. LEXIS 3405

The Eastern District of Texas reached a similar conclusion:

**A review of the applicable regulations and case law on this issue leads the court to conclude that, because the travel at issue in this case was ordinary home-to-work travel, such travel did not qualify as hours worked, even if RGIS had a custom or practice of paying for it.** *Johnson v. RGIS Inventory Specialists*, 554 F. Supp. 2d 693, 706 - 8 ((E.D. Tex., 2007)

19

But the Fifth Circuit has taken a different position, which supports the view that paying for the drive time as Defendants' 9/23/11 policy called for, makes all the drive time, even from home to the first site of the day and from the last site of the day to home, compensable hours worked for overtime purposes:

> Ordinary home-to-work travel is clearly not compensable under the Portal-to-Portal Act **unless a contract or custom of compensation exists** between the employer and the employees. 29 U.S.C. § 254; 29 C.F.R. § 785.34-35, 790.8(f) (1990). *Vega ex rel. Trevino v. Gasper*, 36 F.3d 417, 424 (5th Cir. 1994) (emphasis added)

In the more recent *Chambers* case, the Fifth Circuit repeated this holding:

> It is well settled that ordinary home-to-work travel is not compensable under the Portal-to-Portal Act **in the absence of a contract or custom of compensation that exists between the employer and the employees.** *Chambers v. Sears Roebuck & Co.*, 428 Fed. Appx. 400, 410 – 11 (5th Cir. 2010) (emphasis added)

Clearly, then, plaintiff had ample reason to challenge the defendants' 9/23/11 policy. To the extent that it excluded compensated home to work travel, the policy's application would, arguably, result in a violation, under some (but not all) USDOL/WH Opinions, and under Fifth Circuit jurisprudence. And, as we have seen, so-called "home to work" travel when the plaintiff was out of town and spending the night away from home, driving the employer's truck loaded with tools and parts which had to be transported to his employer's customers' work sites to accomplish his job, was clearly hours worked, especially if compensated.

It should also be noted that Little 0245 – 0246 is a picture of a text message exchange between plaintiff and the person who did payroll, Holly Paola. Her initial message to him appears to be an effort to follow up on the 9/23/11 policy, which, she says, plaintiff has yet to sign and return to her. Holly says that "Keith is holding paychecks next week for any that aren't returned before then." It would be a violation of the FLSA's minimum wage provisions to hold a paycheck beyond the regular payday for such an issue, and if the paycheck included overtime compensation, it would be a violation the Act's overtime provisions as well.

## ANALYSIS OF TIME SHEETS—SOME TRAVEL PAID AS STRAIGHT TIME AND NOT COUNTED TOWARD OVERTIME WAS MANIFESTLY HOURS WORKED

A review of the plaintiff's time sheets shows that the policy as enforced appears to be different than the policy as explained by defendants, and to result in FLSA violations. Exhibit TSP 048 shows that for the pay period ending 10/6/11, paid 10/7/11, the employer recorded 43 hours of drive time and 26 hours of rig time for the week ending 9/30/11. This, however, included 11 hours of drive time (12 – 1 lunch) and 7 rig time from 9/22/11. (It should be noted that of the 18 hours carried forward from 9/22 and added to the week ending 9/29, 3 hours, 1 of rig time and 2 of drive time, took place after

midnight, and so properly belonged on the time sheet for 9/23, and were part of the week ending 9/29.  All of this was paid at straight time.

If we look at the time sheets for 9/23 – 9/29, excluding for a moment the 9/23 time on the time sheet for 9/22, we find a total of 19 hours of rig time, which no one disputes is hours worked, and a total of 32 hours of drive time. Adding these together, we get 51 hours, meaning that there were 11 hours of overtime that week (or 15 hours, if the plaintiff actually worked through lunch but had 1 hour deducted from his total regardless). Since he was paid only straight time for all hours worked this pay period, defendants' drive time policy resulted in a failure to compensate at least 11 hours of overtime properly, or 15 including lunch time deductions. If we add the 3 hours worked on 9/23 which were shown on the 9/22 time sheet, this would increase the overtime hours to 14, or 18.  As I have shown above, all this time should have been counted as hours worked for overtime purposes.

But even if were to assume that defendants are correct in excluding from hours worked time plaintiff spent driving from his home to a job site, and from a job site to home, we find that plaintiff spent the following in such driving:

| | | |
|---|---|---|
| 9/25: | Pecos to Dallas | 8 hours drive time (9 – 1 lunch) |
| 9/26: | Dallas to Sunset to Dallas | 4 hours drive time |
| 9/29: | Dallas to Anderson to Dallas | 7 hours drive time (8 – 1 lunch) |
| Total: | | 19 |

This would mean that 13 hours were spent in drive time other than home to work, which added to the 19 hours of rig time yields 32 hours worked.  If we add the 3 hours worked on 9/23 which were shown on the 9/22 time sheet, this is still only 35 hours, which could be paid at straight time.

In the workweek 9/30 – 10/6, the plaintiff had 28 hours of rig time and 38 hours of drive time for a total of 66 hours paid. This means that 26 hours of overtime which should have been paid at time and a half were paid at straight time (4 more, or 30 hours, if we include lunch deductions).

Again, even if we were exclude every leg involving driving directly from plaintiff's home to a job site, and/or from a job site to plaintiff's home, we exclude the following:

| | | |
|---|---|---|
| 9/30: | Dallas - Springtown – Dallas | 4.5 hours drive time |
| 10/3: | Dallas –Midland | 8 hours drive time (9 – 1 lunch) |
| 10/6: | M55 – Dallas | 7 hours drive time (8 – 1 lunch) |
| Total: | | 19.5 |

21

So 66 hours less 19.5 hours is 46.5, which obviously includes 6.5 hours of overtime (or, with lunch deductions, 10.5 hours of overtime). Plaintiff, however, was paid for 135 hours for this pay period, all at straight time (see TSP 048, also TSP 049, the check stub for this pay period). This means that even viewed in a light most favorable to defendants, their policy as applied resulted in a failure to pay time and a half for all hours worked in excess of 40 in a workweek.

If most or all of the drive time between home and job sites is included, as I have argued above should be the case, then as many as 18 hours from the first week and 30 hours from the second week were paid at straight time when they should have been paid at overtime. Thus for the pay period ending 10/6 there would be up to 48 hours in the two-week pay period which were paid at straight time but should have been paid at time and a half. The policy to which plaintiff asserts he objected did in fact result in a violation of the FLSA.

In the first workweek of the plaintiff's final pay period, he also worked overtime which was not paid at time and a half. In the workweek 10/7 – 10/16, he worked 49 hours (or 50, including the hour deducted for lunch on 10/7) on 10/7, 10/8, 10/10, and 10/11 (on 10/11 his truck was in the shop in Lubbock part of the time, and he was returning to Dallas part of the time. Since he was out of town on his employer's business, and not free to use the time while the truck was in the shop for his own personal activities, any time waiting for the truck to be repaired would be working time). I have not counted as hours worked the 7 hours on 10/12 and the 8 hours on 10/13 he says he spent waiting on estimates on the truck while he was in Dallas. Even omitting all this time, the employer's policy resulted in a failure to pay 9 (or 10, with lunch) hours of overtime at time and a half, as required by the FLSA.

## AUTOMATIC DEDUCTION FOR LUNCH TIME

The defendant automatically deducted 1 hour per day for lunches. In itself, this is not a violation, as long as a mechanism exists to see that the automatic deduction is overridden when they work through lunch. It appears from the deposition testimony of Donna Lear that no such mechanism was in place. If employees didn't take the lunch as they were supposed to, that was their problem:

4   A. -- deduct an hour, because we told them in

5   the very beginning, when they are hired if you

6   work eight hours or more we require you take a

7   lunch. We want you to take a lunch every day.

8   We're telling you to take a lunch every day and

9   if you're not taking lunch, then why are you

10   using my credit card for lunch.

22

11  Q.  For every day do you or Holly cross check

12  the credit card before issuing payroll to see if

13  there's a lunch charge?

14  A.  No, but we have started.

15  Q.  How do you know that they've actually taken

16  lunch before you make that call?

17  A.  We don't. Unless they put it down on their

18  sheet, we know and if they don't, if they work

19  over eight hours, we deduct it because we've

20  told them. If they don't take lunch that means

21  that they're not listening to our policy, to

22  what we tell them to do. (Deposition of Donna Lear, p. , ll. 4 –
      22)

This of course is not what is supposed to happen under the FLSA. Should employees work through lunch in violation of their employer's policies, they must still record the time as hours worked, and if it results in overtime, they must be paid the overtime compensation due. They may be disciplined for violating the policy, but such discipline cannot take the form of disregarding the time they worked.

It also appears that plaintiff objected to this practice. As noted above, Little 0245 – 0246 is a picture of a text message exchange between plaintiff and the person who did payroll, Holly Paola. Her initial message to him appears to be an effort to follow up on the 9/23/11 policy, which, she says, plaintiff has yet to sign and return to her. Plaintiff's response raises the lunch issue: "So does this new policy now mean that we will no longer be deducted an hour for every 8 hours worked?" Holly responds:

I only deduct 1 hour when u work more than 8 hours. And no it doesn't mean that because it is required BY LAW that u take an hour break when working 8 or more hours. this is a labor law so there is nothing we can do about it. sorry.

This exchange might be construed as complaining about the policy. It is certainly questioning it. If this exchange figured into the decision to fire plaintiff, it would further support plaintiff's allegation of retaliatory discharge under FLSA Section 15(a)(3).

OTHER DEDUCTIONS FROM WAGES

Employees are also apparently charged for repairs and maintenance for company vehicles. This is a violation of the Act to the extent that it cuts into minimum wage and/or overtime due. The policy is described by Keith Lear in his deposition:

24   A.  The technician is -- I don't know it

25   verbatim.  It's in the manual, but it says they

115

1   will take care of the maintenance of the

2   vehicle, tires, windshields and such and it's up

3   to them to make sure that the oils are changed

4   and such.

5   Q.  So that is up to the technician?

6   A.  That is up to the technician; that is

7   correct.

8   Q.  To secure and pay for those repairs and on

9   a daily basis?

10   A.  They're responsible for tires, windshields

11   and we pay for the oil changes and any other

12   repairs.

13   Q.  Is an employee responsible for damage that

14   they caused due to their own negligence to that

15   vehicle?

16   A.  Yes. (Depo. of Keith Lear, p. 115, l. 24 – p. 116, l. 16)

## LIQUIDATED DAMAGES

In addition to back wages for minimum wage and/or overtime violations, the FLSA authorizes payment to plaintiffs of liquidated damages, generally in amounts equal to the back wages (see FLSA Section 16(b), which states: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid

overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.")

In the course of my employment with USDOL/WH as an Investigator, I was called upon to make recommendations for litigation if cases seemed suitable and if no satisfactory administrative resolution could be achieved. Part of this recommendation would involve a recommendation for liquidated damages where appropriate. As Assistant District Director, I had far more involvement in this process. If a case couldn't be resolved administratively by an Investigator, it was turned in to me for a second-level conference. If that failed, then it was up to me, after consultation with the District Director, to decide whether to recommend that the file be forwarded through our Regional Office to the Regional Solicitor of Labor. In making this recommendation, I was called upon to address issues of willfulness and of liquidated damages.

If the Court in this case determines that Defendants violated the FLSA, and further awards back wages to Plaintiff, they are subject to the additional liability for liquidated damages. In order to avoid such liquidated damages, Defendants must show two things:

(1) The employers must show to the satisfaction of the court that the act or omission giving rise to such action was in good faith; and (2) he must show also, to the satisfaction of the court, that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act. 29 CFR 790.22.

With regard to the first showing necessary for avoiding liquidated damages, good faith, this is ultimately a fact issue. While I cannot testify as to the state of defendants' minds, however, there are certain facts which can be indicative of state of mind. With regard to the second requirement, that the employer must have had "reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act," this is an objective element. That is, under enforcement policies and procedures of USDOL/WH, the agency evaluated whether a reasonable employer in the place of the defendant would have believed that its conduct complied with the Act. This typically requires that the employer be able to demonstrate that it took steps to ascertain its FLSA obligations.

GOOD FAITH

As I noted above, I cannot read the defendants' minds. However, there are some actions/statements which, if true, would indicate that defendants were not acting in good faith. Keith Lear apparently threatened to withhold plaintiff's paycheck if he did not sign and return his copy of the 9/23/11 drive time policy. In my experience, few if any employers believe that such an action would be compliant with the law, and USDOL/WH would interpret such a threat as evidence of lack of an objective good faith belief that the course of action complied with the law. In addition, the statement by Donna Lear that

25

employees would be subject to a deduction of one hour for lunch even if they did not take a lunch break is evidence of a lack of objective good faith.

## REASONABLENESS

In order to avoid liquidated damages, an employer must not only show that it acted in the good faith belief that it was in compliance. That believe must be reasonable. Courts have typically required that the employer actually **investigate** whether a proposed course of conduct is in compliance with the law to be able to claim a reasonable belief that its conduct complied with the law—see *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 470 (5th Cir. 1979), and its progeny. Here defendant Keith Lear testified that he attended a seminar and asked whether he had to pay for driving from home to work:

3  Q.  Did TSP retain that law firm to provide

4  employment advice?

5  A.  No, sir, we have not.

6  Q.  This is just a seminar they put on?

7  A.  Yes, sir.

8  Q.  Through the NFIB?

9  A.  That is correct.

10  Q.  Did you have to pay to go to the seminar?

11  A.  No, it was free for members.

12  Q.  TSP is a member?

13  A.  TSP was a member.

14  Q.  No longer?

15  A.  No longer.

16  Q.  And did you ask a question like a round

17  table or from the audience about implementing a

18  policy --

19  A.  I asked a direct question.

26

20   Q.   What was the question?

21   A.   The question was, is drive time from

22   somebody's home to the job site considered

23   overtime.

24   Q.   Is that to the best of your recollection

25   how you asked the question?

56

1   A.   Best of my recollection that's how I asked

2   it, because that was my question.

3   Q.   And what was the answer they gave you?

4   A.   The answer was it's not compensable time.

5   Q.   And did you take that to mean that you

6   don't have to pay compensation for that time?

7   A.   That's the way I took it. (Keith Lear deposition, p.56, l3 – p. 57, l. 7)

Mr. Lear does not indicate whether he provided any of the relevant details about the sort of driving his employees did. He doesn't say that he included in his question the fact that they were driving the employer's vehicles, that these vehicles were transporting parts and tools to be used at the job sites, that the job sites were often hundreds of miles from home, and that the employees were often out of town overnight, even for several nights, and went from job sites on one town to job sites in another, and/or to hotels in other cities. Unless he did so, his question at a public seminar would not, in my opinion, be an investigation adequate to meet his burden to prove reasonableness.

In addition, Mr. Lear also adopted a policy of automatically deducting one hour for lunch. I discussed above the fact that such a policy is not on its face illegal, but must include a mechanism for overriding the automatic deduction when employees work through lunch. According to the testimony of Donna Lear, quoted above, there was no such mechanism. In fact, she said that the company's policy was to make the deduction even if the employees worked through lunch, since they had been told they were supposed to take a lunch break.

27

Mr. Lear describes what he did to ascertain if the lunch hour deduction practice was in compliance:

8    Q.   -- did you ask somebody about the one hour

9    policy --

10   A.   Yes, I did.

11   Q.   -- at that seminar?

12   A.   Yes, I did.

13   Q.   Who did you ask?

14   A.   The same attorney.

15   Q.   The same attorney from --

16   A.   The same attorney.

17   Q.   I'm sorry, I thought you said their name?

18   A.   I didn't.

19   Q.   You didn't?

20   A.   No, because I don't remember his name.  I

21   said it was a law firm out of Covington or

22   Mandeville.

23   Q.   That's right, you told me the place.

24   Covington is a town where?

25   A.   The Northshore, above New Orleans.

52

1    Q.   And the seminar was put on by the NFIB?

2    A.   Correct.

3    Q.   National Federation of Independent

28

4    Business?

5    A.   Correct.  Plus I did my own research on the

6    internet.

7    Q.   About the one hour deduction?

8    A.   Correct.

9    Q.   Was that recently or was that in the past?

10    A.   That would have been in the past.

11    Q.   What did you look at on the internet?

12    A.   United States Department of Labor.

13    Q.   At the regulations?

14    A.   Yes, sir.

15    Q.   And you read those regulations?

16    A.   Yes, sir.

17    Q.   From your reading of the regulations, it's

18    your belief that that policy meets those

19    regulations?

20    A.   It does. (Deposition of Keith Lear, p. 52, l. 8 – p. 53, l. 20)

Again, the record does not indicate whether Mr. Lear followed up his question about whether he could deduct for lunch with any effort to clarify what he should do if the employees did not in fact take a lunch.  He says he investigated further by going on the Dept. of Labor's website, and that information he found there confirmed that he could automatically deduct for lunch breaks.   There is nothing on the DOL website which would suggest to an employer that it could promulgate a policy deducting for lunches whether the employees took them or not.  His reading may just indicate that, as a non-lawyer, he was not able fully to make the appropriate determinations.  A reasonable and prudent employer, however, would have consulted with DOL enforcement staff, and/or counsel familiar with this area of the law, before implementing this policy.

29

## CONCLUSIONS

Defendants' 9/23/11 policy as written clearly suggests that hours spent in travel time as a driver of the employer's vehicle transporting tools and parts between job sites and hotels in other cities, on overnight travel, will not be treated as hours worked: "Drive time to/from job sites and hotels will no longer be paid as overtime hours." It therefore calls for a violation of the FLSA. In the course of the lawsuit, defendants description changed in their response plaintiff's interrogatories, where they said that they would pay overtime for time worked at a job site and spent driving between job sites, but mentions nothing about travel from sites to other cities and spending the night away from home, driving to hotels, etc. Only in their depositions did Keith and Donna Lear say that all hours spent in driving other than those from employees' homes to job sites, and from job sites to employees' homes, would be treated as hours worked.

Plaintiff, however, claims he complained about the policy as written and promulgated, and clearly he had no access to evidence produced in discovery long after he was terminated. Accordingly, if he complained about the terms of the policy as written, and was fired for doing so, he would have been fired for complaining about a policy which called for violations of the FLSA.

Defendants also had other policies which resulted and/or could result in violations of the Act. Failure to pay for instances when employees worked through lunch, if any, would result in FLSA violations if such instances occurred in overtime workweeks. Similarly, requiring employees to pay for vehicle maintenance and repairs would result in FLSA violations if it reduced employees below minimum wage for up to 40 hours in any workweek, or reduced either straight time or overtime compensation during any hours above 40 in any workweek.

If defendants are found to be in violation of the Act, they cannot successfully assert as a defense against the imposition of liquidated damages a claim that they acted in the good faith belief that their conduct complied with the Act, and that such belief was reasonable.

## COMPENSATION

I am billing $300 per hour for all work on this case other than testimony, plus reasonable expenses. Testimony in deposition or in court will be billed at $350 per hour.

Dated: January 28, 2013

Brian T. Farrington

30

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com